# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL COUNCIL OF                    :
SHOPPING CENTERS, INC.,                     :
                                            :
      Plaintiff,                 :        Civil Action No.:        20-2551 (RC)
                                            :
      v.                         :        Re Document Nos.:        3, 12
                                            :
RECONCRE, LLC,                              :
                                            :
      Defendant.                 :

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND
### DENYING DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

The organizer of a prominent retail real estate conference has brought suit against a small commercial real estate firm in Washington, D.C.  The conference organizer, International Council of Shopping Centers, Inc. ("ICSC"), alleges that the real estate firm, RECONCRE, LLC, uses logos that infringe on the trademark associated with its conference.  ICSC asks the Court to preliminarily enjoin RECONCRE from using its name or logos while the suit plays out.  *See* Pl.'s Mot. Prelim. Inj. ("Pl.'s Mot."), ECF No. 3.  RECONCRE asserts that ICSC has not pleaded a claim and requests dismissal of the complaint.  *See* Def.'s Mot. Dismiss ("Def.'s Mot."), ECF No. 12.  For the following reasons, the Court denies both motions.

## II. BACKGROUND

ICSC is a trade group that represents the interests of the retail real estate and shopping industry.  Compl. ¶¶ 1, 6, ECF No. 1.  Every year, it holds a conference in Las Vegas called "RECon."  *Id.* ¶ 7.  The conference attracts more than 30,000 attendees who include real estate brokers, developers, and retailers.  *Id.*  RECon's primary purpose is to facilitate deal making, but

it also offers seminars on various topics such as commercial lease negotiation and advising commercial real estate clients. *Id.* Since 2008, ICSC has promoted RECon with the logo below:



*Id.* ¶ 10. The logo appears on ICSC's website, on conference signage and brochures, and in advertisements. *Id.* ¶ 12. ICSC registered the RECon logo as a trademark in 2009. *Id.* ¶ 11; *see also id.* Ex. A, ECF No. 1-1 (registration certificate).

Commercial real estate professional Wesley Neal founded RECONCRE in 2019. Compl. ¶¶ 16, 22; Neal Decl. ¶¶ 1–2, ECF No. 13-1. RECONCRE advises clients on buying, selling, and leasing small commercial properties in the Washington, D.C. metropolitan area. *See* Compl. ¶ 17; Neal Decl. ¶¶ 2, 7–8. The firm's primary logo (the one found on its website and most of its promotional materials) looks like this:



Compl. ¶ 19. RECONCRE also uses the following variations of its logo on some fliers linked to its website:

*Id.*; *see also* Neal Decl. ¶ 9. Before Neal started RECONCRE, he was a member of ICSC for several years and attended RECon once. Compl. ¶ 22; Campbell Decl. ¶ 40, ECF No. 3-1.

ICSC became aware of RECONCRE in April 2020.  *See* Campbell Decl. ¶ 43; *see also* Compl. ¶ 23.  According to ICSC, it "received an email from a third party commenting on the similarity of the ICSC's RECon logo and [RECONCRE's] RECON marks."  Compl. ¶ 23.  The third party remarked: "[N]umerous people have asked us if RECON DC is part of your organization."  *Id.*  When ICSC's general counsel asked for more information, however, the third party said it "prefer[red] to not get involved beyond bringing this matter to your attention."  Pl.'s Mot., Ex. V, at 2, ECF No. 3-23; *see also* Compl. ¶ 23.  ICSC quickly sent a cease-and-desist letter to RECONCRE, asserting that the firm's logos infringed on its RECon mark.  Compl. ¶ 24. The next month, ICSC sent a second cease-and-desist letter demanding that RECONCRE stop using its infringing logos.  Compl. ¶ 25.  RECONCRE refused.  *Id.*

ICSC filed suit in September 2020.  *See* Compl.  Along with its complaint, it filed a motion for a preliminary injunction barring RECONCRE from using the allegedly infringing logos.  *See* Pl.'s Mot; *see also* Def.'s Opp'n Mot. Prelim. Inj. ("Def.'s Opp'n"), ECF No. 13. RECONCRE countered with a motion to dismiss.  *See* Def.'s Mot; *see also* Pl.'s Opp'n Mot. Dismiss ("Pl.'s Opp'n"), ECF No. 16; Def.'s Reply Supp. Mot. Dismiss ("Def.'s Reply"), ECF No. 17.  Today, the Court resolves both motions.

### III.  ANALYSIS

This case is in an unusual posture: ICSC's motion for a preliminary injunction and RECONCRE's motion to dismiss are pending before the Court at the same time.  Although the preliminary injunction motion was filed earlier, the Court addresses the motion to dismiss first because dismissal would moot the need for a preliminary injunction.  Accepting the facts in the complaint as true, however, the Court holds that ICSC has stated plausible claims.  The Court then denies ICSC's motion for a preliminary injunction.  The divergent outcomes are a function

3

of the different burden associated with each motion.  ICSC pleads enough facts to satisfy the low

plausibility standard that governs motions to dismiss, but it fails to meet the much heavier burden

of clearly showing that it is entitled to a preliminary injunction.

### A.  RECONCRE's Motion to Dismiss

RECONCRE moves to dismiss ICSC's complaint for failure to state a claim.  Def.'s Mot;

*see also* Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain

sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Plausibility requires the plaintiff to "plead[] factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "A Rule

12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not

require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any

evidence to back up what is in the complaint.'"  *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C.

Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)).  Accordingly, a

court entertaining a motion to dismiss "assumes the truth of all well-pleaded factual allegations

in the complaint and construes reasonable inferences from those allegations in the plaintiff's

favor but is not required to accept the plaintiff's legal conclusions as correct."  *Sissel v. U.S.*

*Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014) (citations omitted).  It may not

look beyond the complaint except in a few narrow circumstances.  *See EEOC v. St. Francis*

*Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

ICSC brings four claims in its complaint: trademark infringement and false designation of

origin under the Lanham Act, and trademark infringement and unfair competition under D.C.

common law.  Compl. ¶¶ 31–55.  Each of these claims require ICSC to prove the same three

elements: "(1) that it owns a valid trademark, (2) that its trademark is distinctive or has acquired a secondary meaning, and (3) that there is a substantial likelihood of confusion between the plaintiff's mark and the alleged infringer's mark." *AARP v. Sycle*, 991 F. Supp. 2d 224, 229 (D.D.C. 2013) (quoting *Globalaw Ltd. v. Carmon & Carmon Law Off.*, 452 F. Supp. 2d 1, 26 (D.D.C. 2006)); *see also id.* n.2.   RECONCRE challenges the sufficiency of ICSC's pleading only as to likelihood of confusion, *see* Def.'s Mot. at 5, so the Court will limit its motion-to-dismiss analysis to that third element.   *See Cohen v. Bd. of Trustees of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists." (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2015)).

For a plaintiff to establish a likelihood of confusion between two marks, he must show that "an appreciable number of ordinary prudent consumers are likely to be misled, or simply confused, as to the source of the goods in question." *Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*, 929 F. Supp. 473, 476–77 (D.D.C. 1996) (quoting *Sears, Roebuck & Co. v. Sears Fin. Network*, 576 F. Supp. 857, 861 (D.D.C. 1983)).   An alleged infringer's mark does not need to be identical to the plaintiff's mark for it to confuse consumers.   *See Am. Ass'n for Advancement of Sci. v. Hearst Corp.*, 498 F. Supp. 244, 258 (D.D.C. 1980).   Nor does a plaintiff need to present evidence of actual consumer confusion, though such evidence "is substantial proof of the fact of likelihood of confusion." *Id.*

Courts in this district consider the eight *Polaroid* factors in assessing likelihood of confusion: (i) the strength of the plaintiff's mark; (ii) the degree of similarity between the two marks; (iii) the proximity of the parties' products; (iv) the likelihood that the prior user will bridge the gap between its market and the second user's market; (v) evidence of actual

confusion; (vi) the defendant's intent; (vii) the quality of the defendant's product; and (viii) the sophistication of customers in the relevant market.  *Malarkey-Taylor Assocs.*, 929 F. Supp. at 477 (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).  None of the factors is "individually determinative."  *Globalaw Ltd.*, 452 F. Supp. 2d at 48.  Indeed, the fact-intensive nature of the balancing inquiry "ordinarily does not lend itself to a motion to dismiss."  *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006); *see also* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:121.75 ("McCarthy on Trademarks") (5th ed. 2020) ("Because all a plaintiff need do is allege a plausible claim that confusion between the marks is likely, it will be the unusual trademark infringement case where a Rule 12(b)(6) motion is appropriate.").

ICSC has asserted facts that, if true, would make consumer confusion plausible.  For starters, it has alleged facts suggesting that its RECon mark may be strong.  "The strength of a mark refers to its distinctiveness or its tendency to identify the goods sold under the mark as emanating from a certain source."  *Nat'l Info. Corp. v. Kiplinger Wash. Editors, Inc.*, 771 F. Supp. 460, 463 (D.D.C. 1991).  One measures a mark's strength along two axes: conceptual strength, or how distinctive a mark is among marks, and commercial strength, "the marketplace recognition value of the mark."  2 McCarthy on Trademarks § 11:80.  The Court will explain below why the RECon mark has limited conceptual strength.  But even a wholly indistinct mark may have enough commercial strength to "become well recognized by the consuming public."  *Id.* (listing "Kentucky Fried Chicken" as an example); *see also Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 663 (4th Cir. 2018) ("[I]f a mark has sufficient commercial strength such that consumers would 'associate the mark with a unique source,' it may be considered strong despite its conceptual weakness. (citation omitted)).  ICSC's complaint indicates that may

be true for the RECon mark.  It claims that the conference is well known in the retail real estate and shopping center industries.  Compl. ¶ 13.  Indeed, more than 30,000 real estate professionals and 1,000 exhibitors attend the conference every year.  *Id.* ¶ 7.  Moreover, ICSC has worked to associate its RECon mark with the conference: since 2008, it has used the mark to promote the event on its website, in advertisements, in emails to its member network and former attendees, on conference materials such as signage and brochures, and in social media posts.  *Id.* ¶¶ 10, 12. These facts provide circumstantial evidence of the mark's commercial strength.  *See Sears, Roebuck & Co.*, 576 F. Supp. at 862 (explaining that one can infer a mark's strength from factors such as the duration of its use, the extent of advertising and promotion associated with it, and figures showing the number of people who have viewed it); *see also* 2 McCarthy on Trademarks § 15:48.

The parties' marks also share similarities that could plausibly confuse consumers. Because similarity depends on "the general impression" that the marks would give a consumer, confusion may be likely notwithstanding "minor differences . . . if the dominant portion of both marks is the same."  *Am. Ass'n for Advancement of Sci.*, 498 F. Supp. at 259; *see also Appleseed Found. Inc. v. Appleseed Inst., Inc.*, 981 F. Supp. 672, 676 (D.D.C. 1997).  Here, the only word in ICSC's mark—"recon"—is the dominant word in each of RECONCRE's marks. RECONCRE's marks use font color to distinguish between "RECON" and "CRE," and "RECON" dominates the marks because it is the lead word (so consumers typically notice it first).  *See In re Detroit Athletic Co.*, 903 F.3d 1297, 1303 (Fed. Cir. 2018).  RECONCRE's primary logo further emphasizes the dominance of the word "RECON" by putting it in bold typeface.  *Cf. Sears, Roebuck & Co.*, 576 F. Supp. at 862 ("Defendants emphasize the word SEARS in relation to the other words in its name by using larger and bolder type that is

substantially similar to the type used by plaintiff.").  Moreover, both parties' marks use similar fonts with letters that are all the same size—which may well lead a consumer to miss the fact that RECONCRE's marks capitalize all the letters in "RECON" while the last two letters in the RECon mark are lower-case.  *Cf. id.  Contrast Globalaw Ltd.*, 452 F. Supp. 2d at 49 ("Even if the marks are composed of the same words and are pronounced the same, they may be distinguished by . . . the use of different font sizes . . . .").  The similarity between the RECon mark and the red-and-white mark on RECONCRE's fliers is particularly striking because both marks use the same color scheme.  There are some differences—particularly between the RECon mark and RECONCRE's main logo—which the Court discusses in detail below.  But for now, the marks share enough in common to make it plausible that consumers in the marketplace could confuse the two.  *Cf. Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 781 (N.D. Ill. 2011) (refusing to dismiss trademark infringement claim despite differences in coloration and font because obvious textual and aural similarities would likely stand out more while a consumer was browsing the internet).  *Contrast Le Book Pub., Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 311 (S.D.N.Y. 2005) (dismissing trademark infringement claim because otherwise "physically and visually distinct" marks shared only the word "book" in common).

In addition, facts in ICSC's complaint indicate that the parties' products are related.  The proximity factor "focuses on whether the two products compete with each other" because products or services that "serve the same purpose" or "fall within the same general class" are more likely to be confused.  *Globalaw Ltd.*, 452 F. Supp. 2d at 50 (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 458 (2d Cir. 2004)).  That said, the parties do not need to be in "direct competition" to be proximate to one another.  *Appleseed Found.*, 981 F. Supp. at 674.  It is enough if consumers "are likely to believe that [the] defendant's products or services come from

the same source or are affiliated with [the] plaintiff." *Id.* at 675; *accord* 4 McCarthy on

Trademarks § 24:6.  And "the greater the similarity in the marks, the lesser the similarity

required in the goods or services of the parties to support a finding of likely confusion."  4

McCarthy on Trademarks § 23:20.50.  Here, ICSC alleges that its RECon conference brings

together real estate brokers, developers, and retailers to make commercial real estate deals.

Compl. ¶¶ 7, 14.  Conference attendees participate in seminars on commercial lease negotiations,

representing commercial tenants, and advising commercial real estate owners on finding tenants.

*Id.*  RECONCRE does not organize conferences, but it does provide commercial real estate

advisory services and works with many of the same kinds of professionals that attend RECon.

*Id.* ¶ 17.  Indeed, ICSC even alleges that Neal attended RECon a year before starting

RECONCRE.  *Id.* ¶ 22.  So although the organizations provide different services, they both

operate in the same general market.  That makes it more plausible that consumers could be

confused by the parties' somewhat similar marks.

     ICSC alleges it has evidence of actual consumer confusion too.  As mentioned, such

evidence is "substantial proof of the fact of likelihood of confusion."  *Am. Ass'n for*

*Advancement of Sci.*, 498 F. Supp. at 258.  ICSC says that it "received an email from a third

party commenting on the similarity of the ICSC's RECon logo and Defendant's RECON marks."

Compl. ¶ 23.  According to ICSC, the sender stated that "[n]umerous people ha[d] asked [it] if

RECON DC [wa]s part of [ICSC's] organization."  *Id.* (first alteration in original).  The Court

explains below why there is reason to doubt this allegation's veracity, but at the motion-to-

dismiss stage it must assume "all the allegations in the complaint are true (even if doubtful in

fact)."  *Twombly*, 550 U.S. at 555.  Accepting the allegation as true, repeated inquiries regarding

the relationship between ICSC and RECONCRE certainly make it more plausible that consumers

are likely to be confused. *See Malarkey-Taylor Assocs.*, 929 F. Supp. at 477–78 (assigning "some weight" to "evidence of inquiries from customers and potential customers concerning the relationship" between the parties and their services); *Nat'l Rural Elec. Co-op Ass'n v. Nat'l Agr. Chem. Ass'n*, No. 91-cv-1568, 1992 WL 477020, at *3 (D.D.C. Nov. 25, 1992) (noting that repeated inquiries into the relationship between the parties constituted evidence of actual confusion). Documented instances of actual confusion do not need to be "overwhelming" to support an inference of consumer confusion. *See Nat'l Rural Elec. Co-op Ass'n*, 1992 WL 477020, at *3; *see also Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017) ("Even if the anecdotes are minor and isolated, 'courts may not ignore competent evidence of actual confusion.' Testimony of a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support the district court's finding of actual confusion." (citations omitted)); *Am. Ass'n for Advancement of Sci.*, 498 F. Supp. at 258–59 (finding that one witness's testimony constituted evidence of actual confusion). The email ICSC alleges it received thus helps it state a plausible claim.

Finally, ICSC asserts that RECONCRE adopted its mark in bad faith. It claims that Neal must have been familiar with the RECon mark because he was a member of ICSC for five years and he attended the conference the year before founding RECONCRE. *See* Compl. ¶ 22. RECONCRE argues that, even if Neal knew about the RECon mark, awareness of a prior user's mark is not enough on its own to show bad faith. *See* Def.'s Reply at 6–7. It is true that awareness of a prior user's mark "does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Globalaw Ltd.*, 452 F. Supp. 2d at 53 (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995)). Nevertheless, courts have found bad faith when awareness "is accompanied by similarities so strong that it seems plain that

deliberate copying has occurred." *E.g.*, *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993).  Given Neal's likely knowledge of the RECon mark and the similarities between that mark and RECONCRE's marks, it is plausible that—as ICSC puts it— RECONCRE "acted intentionally in its efforts to mirror ICSC's RECon mark and to confuse consumers."  Compl. ¶ 21.  The Court credits RECONCRE's good-faith explanation of the origin and purpose of the RECONCRE name in its preliminary injunction analysis, but at the motion-to-dismiss stage it must draw all inferences in ICSC's favor.  Accordingly, it finds that the intent factor weighs against dismissal.[1]

The remaining factors do not help ICSC (as the Court explains in more detail below). ICSC does not claim that it will ever offer real estate brokerage services like RECONCRE does, nor does it allege that RECONCRE's services are substandard.  *See* Pl.'s Opp'n at 22–24.  And it is hard to deny that commercial real estate market participants are, by and large, sophisticated consumers.  *Cf. Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir. 1991) (explaining that real estate brokers are "sophisticated commercial buyers" because they are experts who "purchas[e] business services or services for resale in the course of their business").  But seeing as ICSC has pleaded facts supporting its cause on the other *Polaroid*

---

[1] RECONCRE also argues that prior knowledge of a mark matters only when the junior user's product is of the same variety listed in the senior user's trademark registration certificate because there is a presumption of a registered mark's validity that "extends only to [those] goods and services."  Def.'s Reply at 6–7 (quoting *Globalaw Ltd.*, 452 F. Supp. at 53).  To the extent that is a correct reading of *Globalaw* and similar caselaw, this Court disagrees.  "[T]he scope of [a mark's] validity and the scope of relief for infringement are not coextensive.  Although the *validity* of a registered mark extends only to the listed goods or services, an owner's *remedies* against confusion with its valid mark are not so circumscribed."  *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 971 (9th Cir. 2007); *accord* 4 McCarthy on Trademarks §§ 23:76, 24:65; *see also Charles Schwab & Co., Inc. v. Hibernia Bank*, 665 F. Supp. 800, 804 (N.D. Cal. 1987) ("The rights of the owner of a registered trademark are not limited to protection with respect to the specific goods stated on the certificate, but extend to any goods related in the minds of a consumer in the sense that a single producer is likely to put out both goods.").

factors, the Court cannot say that ICSC has failed to make a plausible showing of consumer confusion—especially because that question is such a fact-sensitive one.  This case does not present one of the "rare situation[s]" involving consumer confusion in which dismissal is appropriate.  *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 897 (9th Cir. 2019) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)).  RECONCRE's motion to dismiss is denied.

### B.  ICSC's Preliminary Injunction Motion

A party who seeks a preliminary injunction must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The "preliminary injunction is an extraordinary and drastic remedy," so a court should grant one only if "the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948, at 129–130 (2d ed. 1995)).

Historically, the D.C. Circuit followed a "sliding scale" approach to the four-factor preliminary injunction test.  Under that approach, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). Lately, however, the circuit court has called into question the continued vitality of the sliding scale approach in light of a recent Supreme Court decision.  *See Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014); *Sherley*, 644 F.3d at 392–93; *see also Winter*, 555 U.S. at 374–76.

It may be "that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" unaffected by a plaintiff's showing on the other factors. *See Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)).

Regardless of the exact nature of the inquiry, the Court holds that ICSC has not clearly shown that it is entitled to a preliminary injunction. *See id.* ("We need not wade into this circuit split today because . . . in this case a preliminary injunction is not appropriate even under the less demanding sliding-scale analysis."). The Court first explains why ICSC fails to meet the hefty burden of clearly showing that it will likely succeed on the merits. Then, having found that "most important factor" to weigh against ICSC, *Fed'n Internationale De Football Ass'n v. Nike, Inc. (FIFA)*, 285 F. Supp. 2d 64, 68 (D.D.C. 2003), the Court describes why the other three factors disfavor a preliminary injunction too.

### 1. ICSC Has Not Clearly Shown It Is Likely to Succeed on the Merits

Recall that ICSC must prove three elements to succeed on its claims: "(1) that it owns a valid trademark, (2) that its trademark is distinctive or has acquired a secondary meaning, and (3) that there is a substantial likelihood of confusion between the plaintiff's mark and the alleged infringer's mark." *AARP*, 991 F. Supp. 2d at 229 (quoting *Globalaw Ltd.*, 452 F. Supp. 2d at 26). RECONCRE again focuses its attack on the third element, Def.'s Opp'n at 8, so the Court discusses the first two just briefly.

ICSC will likely satisfy elements one and two. It attached to its complaint a registration certificate. *See* Compl., Ex. A. Proof of registration "qualifies as prima facie evidence of [ICSC's] ownership of the mark" and raises a presumption that the mark is valid. *Yah Kai World Wide Enters., Inc. v. Napper*, 195 F. Supp. 3d 287, 311 (D.D.C. 2016). Furthermore, ICSC has used its mark since 2007, Campbell Decl. ¶ 16, whereas RECONCRE was not founded until

2019, Neal Decl. ¶ 1.  ICSC's prior use gives it superior rights at common law.  *See Yah Kai World Wide Enters.*, 195 F. Supp. 3d at 311 (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:1.50 (4th ed. 2016)).  ICSC's mark is probably distinctive too.  Registration, in addition to constituting evidence of a mark's ownership and validity, also makes a mark "presumptively distinctive."  *Id.* at 315; *see also Am. Ass'n for Advancement of Sci.*, 498 F. Supp. at 254.  RECONCRE does not try to rebut that presumption.

ICSC does not fare so well on the third element.  Earlier, the Court held that ICSC pleaded enough facts to show that consumer confusion was plausible.  But now, when presented with exhibits and declarations from both sides, the Court holds that ICSC cannot clear the much higher hurdle of showing that it will have probably proven consumer confusion by the time this lawsuit ends.  To be sure, some of the *Polaroid* factors continue to support ICSC's case.  On the whole, however, the factors indicate that sophisticated consumers in the commercial real estate market are unlikely to confuse the parties' similar, but distinguishable, marks.

*a. The RECon Mark's Strength*

To begin, ICSC's mark seems strong within the retail real estate and shopping center industries.  Its strength is largely commercial rather than conceptual.  "Measuring a mark's conceptual or inherent strength focuses on the linguistic or graphical 'peculiarity' of the mark, considered in relation to the product, service, or collective organization to which the mark attaches."  *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006) (citation omitted).  Typically, a mark's use of words that plainly describe the associated product make the mark conceptually weaker while a mark's use of words that have little connection to the product make the mark conceptually stronger.  *See Yah Kai World Enters.*, 195 F. Supp. 3d at 314, 317.  It is unclear how that linguistic measure of conceptual strength applies to the RECon mark.  On

the one hand, if one reads the mark as an abbreviation for "reconnaissance," then it conveys a common meaning unrelated to the service it identifies. Such "arbitrary" marks are conceptually strong. *See id.* On the other hand, "RECon" appears to be a portmanteau of the words "Real Estate" or "Retail" and "Conference." Descriptive marks that "directly identify or describe some aspect, characteristic, or quality of the product/service to which they are affixed" tend to be conceptually weak. *Id.* at 314.

In any case, designation of a mark as arbitrary or descriptive "does not resolve the mark's conceptual strength." *See CareFirst of Md.*, 434 F.3d at 270. No matter how one classifies a mark, "[t]he frequency of prior use of a mark's text in other marks, particularly in the same field of merchandise or service, illustrates the mark's lack of conceptual strength." *Id.* (cleaned up) (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1530–31 (4th Cir. 1984)); *see also FIFA*, 285 F. Supp. 2d at 72 (explaining that a descriptive mark is "particularly" weak when "the words making up the mark are in the public domain and have been extensively used by third parties in other marks"). RECONCRE lists a litany of conferences and real estate organizations that use the name "RECON" in some form. *See* Def.'s Opp'n at 11–12; *see also id.*, Exs. C–H, ECF Nos. 14-1 to -6. The frequency of the word's use elsewhere indicates that the RECon mark lacks conceptual strength. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373–74 (Fed. Cir. 2015) ("[E]xtensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established." (citation omitted)).

But as the Court observed earlier, even if the RECon mark lacks conceptual strength, it does appear to have commercial strength within the retail real estate industry. Evidence of a mark's commercial strength may include "the duration and continuity" of its use, "the extent of

advertising and promotion" dedicated to it, "figures showing sales" or consumer views, and identification of the parties' respective markets. *Sears, Roebuck & Co.*, 576 F. Supp. at 862. Those kinds of evidence are present here.  ICSC has used the RECon mark continuously since 2007, and each year the RECon conference attracts about 30,000 attendees and 1,000 exhibitors (which ICSC says makes it "the largest retail real estate gathering in the world").  *See* Campbell Decl. ¶¶ 10–12, 15.  ICSC puts the RECon mark on its website, conference signage, advertisements, brochures and fliers, and "promotional swag."  *Id.* ¶ 17; *see also* Pl.'s Mot., Ex. B, ECF No. 3-3.  It also advertises the conference through real estate–focused publications, industry websites, and targeted emails to its more than 55,000 active members.  Campbell Decl. ¶¶ 4, 19–21; *see also* Pl.'s Mot., Exs. E–F, ECF Nos. 3-6 to -7.[2]  Finally, ICSC attaches to its motion several articles on third-party industry websites and blogs that emphasize the prominence of RECon within the retail real estate industry (some go so far as to call it the "Super Bowl" of that industry).  *See* Pl.'s Mot., Exs. J–O, ECF Nos 3-11 to -16.  RECon may not be known to a pedestrian on the street, but ICSC has shown the mark likely has strength among retail real estate professionals.  *Cf. Appleseed Found.*, 981 F. Supp. at 675–76 ("Plaintiff's 'Appleseed' mark, while perhaps not powerful in the general population, is relatively strong within the narrow public service field.").

### b.  Similarity of the Two Marks

The Court has already explained that the parties' marks share some similarities.  Most notably, the marks include the same dominant word—"recon"—and use similar fonts with letters

---

[2] ICSC reports that is has spent over $1 million advertising RECon in the past five years. Campbell Decl. ¶ 24.  But without context—for instance, benchmarks from similar organizations or information on ICSC's budget—it is difficult to put this figure in perspective.

that are all the same size.  The red-and-white mark on RECONCRE's fliers and the RECon mark are especially alike because they use the same color scheme.

Despite those similarities, however, significant differences between RECONCRE's primary logo and the RECon mark diminish the weight of this factor.  Most obviously, whereas the RECon mark uses a red-and-white color scheme, RECONCRE's primary logo is in a green-and-brown camouflage theme.  *Cf. King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1091 (10th Cir. 1999) (explaining that two marks were dissimilar in part because one mark used "camouflage colors" while the other used "brilliant blue, purple, red, and orange").  On top of that, RECONCRE's primary logo includes a green radar screen graphic in its "O" that is missing from the RECon mark.  *Cf. FIFA*, 285 F. Supp. 2d at 73 (differentiating between two marks that used similar words because one included "a distinct font and graphical element").  Finally, the RECONCRE logo contains in small type at the bottom: "Reconnaissance Commercial Real Estate Advisory."  The RECon mark contains no similar explanatory language.

Faced with one RECONCRE mark that is quite similar to the RECon mark and another RECONCRE mark that, notwithstanding some common features, is fairly different from the RECon mark, the Court concludes that this factor provides only weak support for ICSC.  The Court would be more inclined to weigh this factor heavily in ICSC's favor if RECONCRE's flier logo was its main one.  Instead, that logo appears only on "certain . . . flyers (linked to as PDF files from [RECONCRE's website])."  Neal Decl. ¶ 9.[3]  The mark most prominently featured on

---

[3] The Court likewise accords little weight in its consumer confusion analysis to RECONCRE's email mark.  That mark is also quite similar to the RECon mark.  It uses a red-and-black color scheme to differentiate between the words "RECON" and "DC," and it lacks the distinguishing characteristics of the main RECONCRE logo.  The email mark bears particular resemblance to variants of the RECon mark associated with some of ICSC's satellite conferences that have titles like "RECon New York."  *See* Campbell Decl. ¶¶ 31–32.  But it appears that RECONCRE no longer uses the email mark.  Neal's email address now uses "RECONCRE" for

the company's website and in its promotional materials is the green-and-brown camouflage logo. *See id.*; *see also* Def.'s Opp'n, Exs. A–B, ECF Nos. 13-2 to -3.   And sophisticated consumers would have little trouble distinguishing that logo from ICSC's RECon mark.

### c. *Proximity Between the Parties' Products and the Chance that ICSC Will Bridge the Gap*

The next two related factors—product proximity and the likelihood that ICSC will "bridge the gap" and enter RECONCRE's market—do not support a preliminary injunction.  As discussed previously, the concern behind the proximity factor is that products or services that "serve the same purpose" or "fall within the same general class" are more likely to be confused. *Globalaw Ltd.*, 452 F. Supp. 2d at 50 (quoting *Savin Corp.*, 391 F.3d at 458).  A court assessing proximity can look to considerations like "whether the products differ in content, geographic distribution, market position, and audience appeal."  *Id.* at 51 (quoting *Savin Corp.*, 391 F.3d at 458).  Even if the prior user is not directly competing with the second user now, a court may take into account the possibility that the prior user will expand into the second user's market.  *See id.* (explaining that the bridge-the-gap factor "is designed to protect the senior user's interest in being able to enter a related field at some future time" (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir. 1993)).

In its motion-to-dismiss analysis, the Court found that ICSC's and RECONCRE's products were similar enough to support a plausible inference of consumer confusion.  But although ICSC and RECONCRE operate in the same general field of commercial real estate,

---

its domain name.  *See* Pl.'s Mot., Ex. R, ECF No. 3-19 (D.C. corporate database entry for RECONCRE displaying Neal's email address); Def.'s Opp'n, Ex. A, ECF No.13-2 (RECONCRE's website); *id.* Ex. B, ECF No. 13-3 (RECONCRE marketing material).  And although ICSC's August 3, 2020, Google search of "RECONCRE" returned a result that included a reference to "recondc" and directed users to RECONCRE's website, *see* Pl.'s Mot, Ex. T, ECF No. 3-21, the Court's more recent search did not generate the same result.

they provide completely different services to different geographic markets.  ICSC is a nonprofit trade association for the retail real estate and shopping center industry.  Campbell Decl. ¶ 4.  Its RECon brand is associated exclusively with a conference the primary purpose of which is to facilitate commercial real estate leasing deals among attendees.  *See id.* ¶¶ 10, 13, 18.  It does not offer real estate services beyond bringing players in the industry together, nor does it claim it intends to in the future.[4]  Meanwhile, RECONCRE is a for-profit real estate advisory firm that helps clients buy, sell, and lease small commercial properties in the Washington, D.C. metropolitan area.  *See* Neal Decl. ¶¶ 2, 8; Def.'s Opp'n Exs. A–B.  Because the organizations offer such different services, ICSC has not clearly shown that the industry's sophisticated consumers will likely confuse them.  *Cf. Nat'l Info. Corp.*, 771 F. Supp. at 464 (holding that two financial magazines were not proximate because one aimed to have mass appeal by providing a variety of articles "generally related to personal finance topics" while the other served a more specific, sophisticated population by relating "specialized stock market information").

The minimal overlap in the organizations' geographic footprints does not change the Court's assessment.  ICSC advertises RECon around the world and normally holds the conference in Las Vegas.  Campbell Decl. ¶¶ 12, 31.  Some of its attendees come from the Washington metropolitan area, Campbell Decl. ¶ 11, where RECONCRE conducts all of its business, *see* Neal Decl. ¶ 8; Def.'s Opp'n, Ex. A.[5]  But the fact that an international

---

[4] ICSC perplexingly argues that "[t]here is no gap to bridge because both parties offer the same services" of "dealmaking," "education," and "advice" to commercial real estate professionals.  Pl.'s Mot. at 24.  The Court disagrees.  ICSC organizes conferences where industry players make deals and attend seminars.  RECONCRE advises participants in discrete commercial real estate transactions.  These services are not the same.

[5] ICSC says that 1,800 RECon attendees per year come from the District of Columbia, Maryland, and Virginia.  Campbell Decl. ¶ 11.  As RECONCRE points out, however, that number surely overstates the number of attendees that might encounter RECONCRE because the firm does business only in Washington and its immediate surroundings.  Def.'s Opp'n at 19 n.8.

organization happens to serve some clients in a particular market does not necessarily mean it is in close competitive proximity with a smaller organization that operates exclusively in that market.  *Cf. Globalaw Ltd.*, 452 F. Supp. 2d at 51 (finding no proximity between law firms when one was small and "almost entirely concentrated in the greater New York City area and Israel" while the others were "large law firms with multiple offices" that were "not headquartered in New York" and did not "maintain offices in Israel"); *Carefirst of Md., Inc. v. First Care, P.C.*, 350 F. Supp. 2d 714, 724 (E.D. Va. 2004) (finding no proximity between "a large health insurance company" that "provide[d] health insurance to members all over the country" and "a group of eleven doctors in two offices" that "provide[d] traditional family medical care to people who live[d] in the tidewater area"), *aff'd*, 434 F.3d 263 (4th Cir. 2006).  If anything, savvy market participants may well recognize the localized nature of RECONCRE's business as a characteristic that distinguishes it from a large, international conference held across the country.

### d. Evidence of Actual Confusion

Remember that ICSC claims it has evidence of actual consumer confusion.  It says it received an email from an unidentified "third party . . . who commented on the similarity of the ICSC's RECon logo and Defendant's RECON logos."  Pl.'s Mot. at 21–22.  In addition to alerting ICSC of the possible infringement, the third party remarked that "[n]umerous people have asked us if RECON DC is a part of your organization."  Pl.'s Mot., Ex. V, at 3.

ICSC's allegations were enough to help it survive a motion to dismiss, but the actual email exchange between the third party and ICSC's general counsel Lesley Campbell is, frankly, highly suspicious.  Notably, it lacks any information about the third party whatsoever.  The third party did not sign its emails with a name, title, or organization, nor did Campbell name the third party in her response.  *See id.* at 2–3.  Indeed, even though the third party did not provide its

identity, Campbell did not ask who the sender was.  *See id.*  Then, when Campbell requested

more information, the third party declined to give any.  *Id.* at 2.  What little identifying

information the email exchange contains about the third party—an email address with everything

but the domain name redacted—further troubles the Court.  The domain name is associated with

a company that advertises free email services meant to keep an account holder's identity private.

Def.'s Opp'n at 22 & n.9; *see also Anonymous Email: Tutanota Keeps Your Emails Secure,*

*Private and Anonymous*, Tutanota (May 31, 2018), https://tutanota.com/blog/posts/anonymous-

email/ (last visited Dec. 14, 2020).  And although ICSC tried to redact the first part of the third

party's email address, one can still click the hyperlink to reveal a full address that includes an

alternative spelling of Campbell's first name: leslie1982@tutanota.com.  *See* Pl.'s Mot., Ex. V.[6]

Altogether, these facts raise the possibility that someone within ICSC may have submitted the

"third party tip" for use in litigation.  The origin of this "tip" can be explored in discovery.  Even

if the email exchange turns out to be legitimate, however, there are too many questions for the

Court to accord it any weight in a likelihood-of-confusion analysis for now.

### e. RECONCRE's Intent

The intent "factor considers 'whether the defendant adopted its mark with the intention of

capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior

user's product.'"  *Globalaw Ltd.*, 452 F. Supp. 2d at 53 (quoting *Arrow Fastener Co.*, 59 F.3d at

397).  ICSC asserts that RECONCRE had that sort of bad faith.  *See* Pl.'s Mot. at 22–23.  It

---

[6] The "1982" in the email address could correspond to Campbell's birthyear.  If so, Campbell would be 38 or 39 years old, which would make sense given that she received a "40 Under 40" award in 2017.  *See* Press Release, Nat'l Bar Ass'n, 2017 National Bar Association's "40 Under 40" Award Recipients Announced (June 12, 2017), https://gallery.mailchimp.com/ b493e6c4d31beda32fdaf8e2d/files/c2f6654a-e6c3-4f08-ad6c-4b71e62b83ab/40_Under_40_ release.pdf (last visited Dec. 14, 2020).

points out that Neal was a member of ICSC for five years, that Neal worked for brokers with strong connections to ICSC and RECon, and that Neal attended RECon in 2018. *Id.* at 22. As further support of bad faith, ICSC cites the similarity of the parties' marks and RECONCRE's refusal to stop using its logos after receiving ICSC's cease-and-desist letters. *Id.* at 22–23.

ICSC has not shown that RECONCRE copied its RECon logo in bad faith. RECONCRE credibly explains that military reconnaissance, not the RECon conference, was the inspiration behind its mark. *See* Def.'s Opp'n at 24–25; Neal Decl. ¶¶ 4–8. RECONCRE says that the name serves several functions: it honors Neal's parents, who served in the military; it conveys an interest in serving clients with a military background; and it describes RECONCRE's strategy in uncovering business opportunities. Neal Decl. ¶¶ 5–7. Accordingly, the firm's primary logo includes a radar screen, a camouflage color scheme, and the words "Reconnaissance Commercial Real Estate Advisory" in small type. The firm's website uses the same camouflage color scheme and declares across the top banner: "Proud Supporter of Military Veterans in Real Estate." Def.'s Opp'n, Ex. A. Given those corroborative facts, the Court has little reason to doubt RECONCRE's telling of the mark's origin and purpose. *Cf. Arrow Fastener Co.*, 59 F.3d at 397 ("A finding of good faith may be supported by . . . '[s]election of a mark that reflects the product's characteristics.'" (alteration in original) (citation omitted)). *Contrast Sears, Roebuck & Co.*, 576 F. Supp. at 863 ("This Court has difficulty in accepting defendants' version of the origination of his corporate name.").

ICSC's arguments to the contrary are unconvincing. Although Neal almost certainly encountered the RECon mark at some point before founding RECONCRE, knowledge of a mark "does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Globalaw Ltd.*, 452 F. Supp. 2d at 53 (quoting *Arrow Fastener Co.*, 59 F.3d at 397).

Neal's awareness of the RECon mark, on its own, is therefore insufficient to establish bad faith. *See Nat'l Info. Corp.*, 771 F. Supp. at 465. ICSC does not point to additional facts that support an inference of bad faith either. The parties' marks share some similarities, but notable differences between the RECon mark and RECONCRE's main logo undercut the notion that the marks are so similar "that it seems plain that deliberate copying has occurred." *See Paddington Corp.*, 996 F.2d at 587. And when two marks lack striking similarities, the Court is unwilling to infer bad faith from a defendant's mere refusal to stop using its logo. *Contrast Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Wash.-DC, Md. y Va. v. Partido Revolucionario Dominicano, Seccional de Md. y Va.*, 312 F. Supp. 2d 1, 14–15 (D.D.C. 2004) (finding that a defendant's continued use of a mark after receiving a cease-and-desist letter evidenced bad faith when the parties' names were "strikingly similar" and the defendant used the same insignia in the same manner as the plaintiff). To hold otherwise could penalize a defendant for not capitulating to a cease-and-desist demand even when that demand is unfounded. In sum, ICSC has not made a showing of bad faith.

### f. The Quality of RECONCRE's Product

Courts consider the quality of an alleged infringer's product out of concern that "the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Globalaw Ltd.*, 452 F. Supp. 3d at 55 (quoting *Arrow Fastener Co.*, 59 F.3d at 398); *see also Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993) ("Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product."). ICSC does not attack the quality of RECONCRE's work directly but instead argues that its product is so excellent that RECONCRE's work must be inferior to it. *See Pl.'s

Mot. at 23.  The Court will not entertain ICSC's argument, which focuses incorrectly on its own product and fails to cite any evidence impugning the quality of RECONCRE's work.  *Cf. FIFA*, 285 F. Supp. 2d at 73 (finding that a plaintiff's failure to present evidence showing that the defendant's products were inferior weighed against injunctive relief).

### g. The Sophistication of Customers in the Commercial Real Estate Market

The reason for assessing the sophistication of a market's customers is that a professional purchaser or an expert in a field is likely to be more knowledgeable and therefore less prone to confusion.  *See Homeowners Grp., Inc.*, 931 F.2d at 1111.  By contrast, "unsophisticated buyers increase the likelihood of confusion."  *Globalaw Ltd.*, 452 F. Supp. 2d at 55 (citation omitted). In addition, the larger and more significant the transaction, the more care a customer is expected to take.  *See Homeowners Grp., Inc.*, 931 F.2d at 1111; *see also Globalaw Ltd.*, 452 F. Supp. 2d at 55 ("There is always less likelihood of confusion when products or services are expensive and are purchased after careful consideration.").  ICSC concedes that customers in the commercial real estate market are sophisticated, *see* Pl.'s Mot. at 24–25, so the Court will not belabor the point.  It has already mentioned several times how the market's sophisticated buyers are likely able to differentiate between the RECon conference, which draws attendees from around the world to make retail real estate deals, and RECONCRE, a firm that helps clients with real estate transactions in the Washington metropolitan area.

\* \* \*

To summarize, ICSC has not clearly shown that it will succeed on the merits because it has not demonstrated that consumer confusion is likely.  The RECon mark seems to be strong within the retail real estate industry, and it shares several similarities with RECONCRE's logos. But the parties provide different services to sophisticated customers and cover different

geographic markets.  In addition, ICSC has not presented persuasive evidence of actual

consumer confusion, RECONCRE's bad faith, or RECONCRE's inferior product quality.  ICSC

has, thus, not met its burden to demonstrate that RECONCRE's mark will confuse consumers.

ICSC's failure to demonstrate its likelihood of success—the "most important factor" in assessing

the appropriateness of a preliminary injunction in a trademark dispute—counsels against

granting ICSC's motion.  *See FIFA*, 285 F. Supp. 2d at 68.

    2.  ICSC Has Not Made a Clear Showing on the Remaining Preliminary Injunction Factors

        The other preliminary injunction factors weigh against granting a preliminary injunction

too.  To start with, ICSC has not clearly shown it is suffering irreparable harm.  Aside from

mentioning its dubious evidence of actual confusion, ICSC merely argues that infringement

presumptively injures the prior user by diluting its mark and interfering with its control over its

reputation.  *See* Pl.'s Mot. at 26–27.  Even assuming that presumption is still good law,[7] it comes

into play only when the plaintiff demonstrates likely success on the merits—which ICSC has not

done.  *See Health Ins. Ass'n of Am. v. Novelli*, 211 F. Supp. 2d 23, 28, 32 (D.D.C. 2002).

        ICSC's failure to make a showing on the first two factors dooms its chances on the last

two.  A demonstration of probable consumer confusion—and, correspondingly, infringement—

ordinarily goes a long way toward tipping the equities in a plaintiff's favor and establishing that

an injunction is in the public interest.  When a defendant has infringed a plaintiff's mark, the

hardships associated with an injunction are typically "outweighed by the confusion that w[ould]

likely result from having two" competing marks and by the "plaintiff's loss of control over its

---

    [7] Courts in this district have repeatedly recognized a presumption of irreparable harm that
accompanies infringement.  *See, e.g.*, *Malarkey-Taylor Assocs.*, 929 F. Supp. at 478; *Appleseed
Found.*, 981 F. Supp. at 677.  But some circuit courts have held that the Supreme Court recently
did away with the presumption.  *See* 5 McCarthy on Trademarks § 30:47:30 (collecting cases);
*see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).

reputation."  *See Appleseed Found.*, 981 F. Supp. at 678; *see also Malarkey-Taylor Assocs.*, 929

F. Supp. at 478 ("[T]he balance of harms cannot favor a defendant whose injury results from the

knowing infringement on the plaintiff's trademark.").  Likewise, infringement offends the public

interest in avoiding "confusion over the source or origin of products provided to the public."

*Malarkey-Taylor Assocs.*, 929 F. Supp. at 478; *see also Nat'l Rural Elec. Co-op Ass'n*, 1992 WL

477020, at *6 ("The public does have a right not to be deceived or confused by trademarks.").

Because ICSC has not demonstrated likely success or irreparable harm, however, the costs of an

injunction to RECONCRE loom large.  Requiring RECONCRE to abandon its name would sap

its goodwill and force the small business to rebrand itself completely.  *See* Neal Decl. ¶ 15.

Neither the equities nor the public interest demand that outcome when ICSC has not met its

burden on the other factors.  *See Nat'l Info. Corp.*, 771 F. Supp. at 465.  Consequently, the Court

denies ICSC's motion for a preliminary injunction.

## IV.  CONCLUSION

For the foregoing reasons, RECONCRE's motion to dismiss for failure to state a claim

(ECF No. 12) is DENIED and ICSC's motion for a preliminary injunction (ECF No. 3) is

DENIED.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated: January 14, 2021                                          RUDOLPH CONTRERAS
                                                                United States District Judge